RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

GREG MCNEILLY,

                *Plaintiff-Appellant*,

    *v.*

TERRI LYNN LAND,

                *Defendant-Appellee.*

No. 10-2244

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 10-00612—Janet T. Neff, District Judge.

Argued: November 15, 2011

Decided and Filed: July 3, 2012

Before: MARTIN and GIBBONS, Circuit Judges; STEEH, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Matthew G. Davis, WITTE LAW OFFICES, Lansing, Michigan, for Appellant. Ann M. Sherman, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Matthew G. Davis, WITTE LAW OFFICES, Lansing, Michigan, for Appellant. Ann M. Sherman, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

STEEH, District Judge. Plaintiff-Appellant Greg McNeilly appeals the district court's denial of his request for a preliminary injunction enjoining Defendant-Appellee Terri Lynn Land, in her official capacity as Michigan Secretary of State, from enforcing

---

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

the individual contribution limits for contributions to state House and Senate candidates as set forth in Michigan Compiled Laws (MCL) § 169.252(1).  Because the district court accurately found that the established factors in this case mitigate against a preliminary injunction, its decision is AFFIRMED.

## I.

On June 28, 2010, McNeilly filed an action in the U.S. District Court for the Western District of Michigan challenging the constitutionality of MCL § 169.252(1), which sets limits on individual campaign contributions.  MCL § 169.252(1) provides:

> Except as provided in subsection (5) or (11) and subject to subsection (8), a person other than an independent committee or a political party committee shall not make contributions to a candidate committee of a candidate for elective office that, with respect to an election cycle, are more than the following:
>
> ***
>
> (b) $1,000.00 for a candidate for state senator, or for a candidate for local elective office if the district from which he or she is seeking office has a population of more than 85,000 but 250,000 or less.
>
> (c) $500.00 for a candidate for state representative, or for a candidate for local elective office if the district from which he or she is seeking office has a population of 85,000 or less.

The original act, 1976 PA 388, imposed limits of $250 per state House primary election, $250 per state House election, $450 per state Senate primary election, and $450 per state Senate general election.  The current statute regulates contributions per "election cycle," rather than election.  MCL § 169.211(2) provides: "'Person' means a business, individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, labor organization, company, corporation, association, committee, or any other organization or group of persons acting jointly."  MCL § 169.252(9) provides criminal penalties of $1,000 and up to 90 days in jail for violations of the statute by an individual.  MCL § 169.209(2) defines "[i]ndependent expenditure" as "an expenditure by a person if the expenditure is not made at the direction of, or under the control of, another person and if the expenditure is not a contribution to a committee."

McNeilly attests that he wished to make contributions to the candidate committees of individuals running for state House and state Senate in Michigan in 2010 in excess of the limits imposed by MCL § 169.252(1) for an individual. He attests that he wished to make such contributions for the purpose of helping candidates amass the resources necessary to mount effective challenges in their respective campaigns. He also attests that he feared prosecution for making contributions in excess of the limits in place.

In his action, McNeilly claims the contribution limits violate his rights of political association and political expression under the First Amendment to the United States Constitution. He requests preliminary and permanent injunctive relief and a declaratory judgment. His injunctive relief claim seeks an injunction enjoining Michigan Secretary of State Terri Lynn Land from enforcing MCL § 169.252(1).

On the same day he filed the action, McNeilly filed a motion for preliminary injunction and sought expedited consideration. In his motion, McNeilly requested a preliminary injunction preventing Land from enforcing the contribution limits imposed by MCL § 169.252(1), under which individuals seeking to contribute to political campaigns are limited to $500 per state House candidate committee and $1,000 per state Senate candidate committee. The motion was fully briefed. The district court denied McNeilly's request for expedited consideration and set a hearing date. In the days before the hearing, both sides filed supplemental documents.

On August 30, 2010, the district court held a hearing on McNeilly's motion for preliminary injunction. At the hearing, McNeilly argued Michigan's contribution limits are unconstitutional under the framework established in *Randall v. Sorrell*, 548 U.S. 230 (2006) (plurality). McNeilly acknowledged a state interest in preventing genuine *quid pro quo* corruption but argued the limits are unconstitutional because: (1) they are not indexed to inflation; (2) they "fall below the Vermont limits, when looked at especially in terms of real dollars"; (3) "the volunteer services are also a drag on the ability of one to associate with a candidate of his choice" (which appears to be a reference to limits on money spent in connection with volunteer activities); and (4) "these factors combined

to prohibit challengers from making viable challenges to incumbents." With respect to irreparable harm, McNeilly argued that, although the August 3, 2010 primary had passed, even a momentary deprivation of a First Amendment right constitutes irreparable harm. With respect to the balancing of the harms, McNeilly acknowledged that if a preliminary injunction issued there would be a "gap" of time in which no contribution limits were in place. McNeilly argued it was "possible" the legislature would enact new limits before the November 2010 election.

At the hearing, Land argued a preliminary injunction would harm the public because it was still election season. Land noted the statute and its limits "have been in place for decades" yet McNeilly waited until "four and a half weeks from the May date for filing for candidacy" to file the action. Land emphasized the "balancing of harms" and pointed out the requested preliminary injunction would "leave the state with no limits whatsoever within just months of the general election." Land argued contribution limits are important to avoid not only corruption but the appearance of corruption. Land also argued the public would "suffer both in terms of their turnout at the polls and in terms of an orderly administration of the election season here." Land noted McNeilly had not shown that "any contribution has yet been made in any amount to a state representative or a senate candidate." Land also argued the Michigan contribution limits are not unreasonably low, noting the limits in *Randall* were $200 and $300, respectively. Land argued the statute must be read as a whole and the court should consider the fact that individuals may make unlimited "coordinated independent expenditures" in favor of a candidate. The statute also allows for larger contributions from the parties than the statute at issue in *Randall*.

In rebuttal argument at the hearing, McNeilly disputed Land's interpretation of "coordinated independent expenditures" and argued that the statute is void for vagueness or the functional equivalent of prior restraint.

After argument from both sides, the court denied the motion on the record and entered an order reflecting its decision. The court noted that granting "preliminary injunctive relief is extraordinary" and analyzed the four factors considered in a

preliminary injunction request. In weighing three of the preliminary injunction factors, the court recognized that there was no showing of irreparable harm to McNeilly while there would be significant harm to defendant and the public if a preliminary injunction issued. As to the final factor, likelihood of success, the court found the factor did not favor either side. The court noted it was a "very complex issue" and found *Randall* distinguishable for a number of reasons. The court stated "the only hard evidence in this case thus far is that the statutory limits are not indexed to inflation." The court found this small showing did not lead to the conclusion that McNeilly has a strong likelihood of success on the merits. The court noted the absence of empirical evidence to determine the effect of Michigan's individual contribution limits on the power to mount a campaign. Thus, the court concluded that the factors weighed in defendant's favor and denied McNeilly's request for a preliminary injunction.

## II.

A district court's denial of a request for preliminary injunction is reviewed for an abuse of discretion. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003). "The district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard...Under this standard, we must review the district court's legal conclusions *de novo* and its factual findings for clear error." *Id.* (internal citations omitted). "Moreover, the standard of review that this court must apply to the district court's findings on a preliminary injunction motion is highly deferential." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

## III.

In evaluating a request for a preliminary injunction, a district court should consider: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *American Imaging Services, Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus.,*

*Inc.),* 963 F.2d 855, 858 (6th Cir. 1992).  "[T]he four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied."  *Id.* at 859.  "These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements."  *Id.*  "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion" because a preliminary injunction is an extraordinary remedy.  *Leary*, 228 F.3d at 739.  The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success.  *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974).

McNeilly makes four arguments: (1) that the district court abused its discretion when it failed to place the burden on the state to show the contribution limits are constitutional and thus erred in its consideration of likelihood of success on the merits; (2) that the district court committed error by failing to apply the principle that even a temporary deprivation of a protected right constitutes irreparable harm and by placing the burden on plaintiff to show irreparable harm; (3) that the balance of interests favors granting the preliminary injunction because there are no concerns of genuine *quid pro quo* corruption; and (4) that the public's interest will be served if the court grants a preliminary injunction, because it will allow a greater amount of debate on public policy issues in the upcoming primary.  While McNeilly makes all of these arguments, the bulk of his argument is centered on likelihood of success.

## A.

## Likelihood of Success

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court considered the constitutionality of a number of provisions contained in the Federal Election Campaign Act of 1971.  The Court noted that "[t]he Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities," involving rights of political association and political expression.  *Id.* at 14.  The Court found in "contrast

with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20. This is so because a "limitation on the amount of money a person may give to a candidate or campaign organization . . . permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* at 21. However, "[g]iven the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Id.* at 21. Contribution limits also implicate associational freedoms because "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate." *Id.* at 22.

Under *Buckley*, with regard to contribution limits, "[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25 (internal quotations omitted). In *Buckley*, the Supreme Court found it unnecessary to look beyond the government's purpose of limiting "the actuality and appearance of corruption resulting from large individual financial contributions in order to find a constitutionally sufficient justification for the $1,000 contribution limitation." *Id.* at 26. "To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined." *Id.* at 26-27. "Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Id.* at 27. The Court therefore found that the interests served by the individual contribution limit were sufficient to justify the effect on First Amendment rights. *Id.* at 29. The Court upheld the individual contribution limit as constitutional.

With regard to expenditure limits, the Court in *Buckley* noted that a "restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19. Thus, limits on independent expenditures "impose far greater restraints on the freedom of speech and association than" contribution limits. *Id.* at 44. As a result, limits on personal expenditures are subjected to strict scrutiny. *Id.* at 44-45. The Court found that "independent advocacy . . . does not presently appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions." *Id.* at 46. The Court explained:

> Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.

*Id.* at 47. The Court thus concluded the limit on independent expenditures "fails to serve any substantial government interest in stemming the reality or appearance of corruption in the electoral process" and "heavily burdens core First Amendment expression." *Id.* at 47-48.

In his briefs, McNeilly refers to the standards for both contribution limits and for independent expenditures. However, Land asserts the issue of expenditures is not properly raised in this appeal. Following Land's argument that the issue is not properly before this court, it appears McNeilly dropped his argument that the definition of independent expenditure is unclear and therefore Michigan's statutory scheme is void for vagueness or a prior restraint on speech. The claim before the district court at the time of the preliminary injunction hearing was McNeilly's claim that Michigan's individual contribution limits violate his rights of political association and political expression under the First Amendment. It was only after the district court's denial of McNeilly's motion for a preliminary injunction that McNeilly filed a First Amended

Complaint adding two claims challenging Michigan's provisions regarding independent expenditures. McNeilly's arguments concerning independent expenditures thus will not be considered here.

On the issue of Michigan's individual contribution limits, McNeilly argues the contribution limits are not closely drawn to achieve a sufficiently important state interest. In *Randall*, the Supreme Court examined the constitutionality of Vermont's limits on individual contributions. Applying *Buckley*, a plurality of the Court stated it must determine whether Vermont's limits "prevent candidates from 'amassing the resources necessary for effective [campaign] advocacy.'" *Randall*, 548 U.S. at 248 (quoting *Buckley*, 424 U.S. at 21). The plurality stated: "We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives. In practice, the legislature is better equipped to make such empirical judgments, as legislators have 'particular expertise' in matters related to the costs and nature of running for office." *Id.* (citing *McConnell v. FEC*, 540 U.S. 93, 137 (2003), *overruled in part on other grounds in Citizens United v. FEC*, __ U.S. __, 130 S. Ct. 876, 913 (2010)). Yet, the plurality recognized "the existence of some lower bound." *Id.*

In *Randall*, the individual contribution limits at issue were $200 for a candidate for state representative and $300 for a candidate for state senate per election cycle. *Id.* at 238. The same limits applied to a political committee and to a political party. *Id.* A plurality of the Court found these limits "sufficiently low as to generate suspicion that they are not closely drawn." *Id.* at 249. The plurality noted that, "considered as a whole, Vermont's contribution limits are the lowest in the Nation." *Id.* at 250. Because the limits were "substantially lower than both the limits we have previously upheld and comparable limits in other States," the plurality determined it "must examine the record independently and carefully to determine whether [the statute's] contribution limits are 'closely drawn' to match the State's interests." *Id.* at 253. The plurality considered the following five factors in determining the statute was not closely drawn: (1) whether the "contribution limits will significantly restrict the amount of funding available for

challengers to run competitive campaigns"; (2) whether there is a statutory requirement "that political parties abide by *exactly* the same low contribution limits that apply to other contributors"; (3) whether expenses incurred volunteering are included in contribution limit amounts; (4) whether the contribution limits were adjusted for inflation; and (5) whether the state has a special justification for low and restrictive limits (such as corruption). *Id.* at 253-261.

On the first *Randall* factor, McNeilly argues the limits are preventing challengers from running effective campaigns. McNeilly cites an article entitled "No Contest in Michigan, How Money and Incumbency Reduced Competitiveness in 2004," which was published April 26, 2006, in support of his argument. The article states "due to the state's contribution limits, no single donor had a major impact on any given race." However, in discussing the top 10 business and special interest donors, the article also states "although no committee alone could give enough to influence the outcome of any given race, together the top donors packed quite a punch." The article also found that the House Republican Campaign Committee and the Michigan House Democratic Fund were the two largest contributors to legislative campaigns and that the money from these parties "had a direct impact on the outcome of several races." McNeilly notes that "the Court in *Randall* determined that the plaintiffs in that case did not need to conclusively prove that Vermont's contribution limits restricted challengers – only that the record suggest as much." In *Randall*, the Court stated "the record suggests, though it does not conclusively prove, that Act 64's contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns." 548 U.S. at 253. The plurality found the evidence presented by the plaintiff raised an inference that the contribution limits were so low as to pose an obstacle to candidates in competitive campaigns, and that this evidence was unrebutted. *Id.* at 256. In *Randall*, the parties introduced expert testimony on contributions and specifically on the way contributions from political parties influence competitive races. *Id.* at 254. The same quality or quantity of evidence is not present in this case. In addition, Michigan does not have the same limitations on political party contributions that were discussed by the experts in *Randall*. Land cites a more general but recent study suggesting low contribution limits

actually enhance competitiveness in elections. Land also argues that the 1989 revision to Michigan's statute, which changed limits from election to election cycle, allows more flexibility for the contributor and candidate to decide at what time, and in which election, the money is best spent strategically. The record before this panel does not suggest that Michigan's contribution limits significantly restrict the funding for challengers to run competitive campaigns.

On the second *Randall* factor, McNeilly admits Michigan's statute does not provide that political parties abide by the exact same contribution limits that apply to individual contributors. At the hearing on the motion for preliminary injunction, McNeilly admitted "one particular facet here that is not at issue is the contribution limits imposed in Randall in Vermont on political parties. And in Michigan, political parties are able to give I'm almost sure it's 20 times the contribution limit of a person." This factor thus does not suggest that Michigan's contribution limits are unconstitutional.

On the third *Randall* factor, the statute's treatment of volunteer services, McNeilly argues Michigan's limits on volunteer contributions are nearly identical to the limits imposed by Vermont in *Randall*. However, MCL § 169.204(C)(3) excludes, from the definition of contribution, up to $500 in travel expenses incurred volunteering and $100 in food and beverage donations. These exclusions were not present in *Randall*, and the importance of such exclusions was emphasized in *Randall*:

> But the Act does not exclude the expenses those volunteers incur, such as travel expenses, in the course of campaign activities . . . unlike the Federal Government's treatment of comparable requirements, the State has not (insofar as we are aware) created an exception excluding such expenses . . . . The absence of some such exception may matter in the present context, where contribution limits are very low.

548 U.S. at 259-60. Given the statute's exception for a certain amount of volunteer-related expenses, this factor does not suggest Michigan's contribution limits are unconstitutional.

On the fourth *Randall* factor, McNeilly states Michigan's contribution limits are not indexed to inflation. McNeilly appears most focused on this factor, arguing that the

"real dollar amounts" of the contribution limits have declined by almost 75 percent over time as the limits "haven't been substantially adjusted for more than 34 years." In *Randall*, the Supreme Court stated "[a] failure to index limits means that limits which are already suspiciously low . . . will almost inevitably become too low over time." 548 U.S. at 261. McNeilly disagrees with Land's statement that "the limits should be evaluated on their face, not in relation to their value in 1976", arguing such a position ignores *Randall*. However, McNeilly ignores a significant phrase in *Randall* – the failure to index becomes particularly significant for contribution limits "*which are already suspiciously low.*" *Id.* at 261 (emphasis added). Thus, Land's argument about the present amount of contribution limits, without reference to whether they have been indexed, is relevant. Land cites a 2010 state limits survey showing that Michigan's contribution levels are not the lowest in the nation. The survey shows that, as of January 20, 2010, Arizona allows $410 per election cycle for legislative candidates, Delaware allows $600 per election cycle for legislative candidates, Colorado allows $200 per legislative candidate per election, and Maine allows $250 per senate candidate per election. After the survey was published, Montana raised its limit to $250 per legislative candidate per election. Land also notes that Michigan's limit for House races is more than double the limit in *Randall* and for Senate races is more than triple the limit in *Randall*. Michigan's contribution limits rank lower than average overall, and this factor, at best, may weigh slightly in favor of McNeilly.

On the fifth *Randall* factor, McNeilly argues "individual donors to state legislative races raise no concern about genuine *quid pro quo* corruption because the state does not create laws to inure to the benefit of just one person." McNeilly argues "[b]ecause Defendant cannot demonstrate that any Michigan statute exists as a result of contributions for votes, this Court should determine that Plaintiff has a substantial likelihood of prevailing on the merits." McNeilly cites a *Detroit Free Press* article suggesting Manuel Moroun's political contributions did not ensure his business interests as owner of the Ambassador Bridge to Canada were protected by those politicians. Land notes the article is not conclusive as: a) Moroun may not be representative of Michigan contributors since he gave to both Republicans and Democrats; b) the bridge project is

not necessarily representative of a contributor's ability to sway politicians on other issues; and c) the size of Moroun's individual contributions have thus far been limited by Michigan's statute, the very limits at issue in this case. Moreover, Land notes the Supreme Court's decisions articulating the importance of contribution limits in preventing *quid pro quo* corruption *and the appearance of quid pro quo corruption*. In *Buckley*, the Court found sufficient justification for contribution limits having the "purpose to limit the actuality and appearance of corruption resulting from large individual financial contributions." 424 U.S. at 26. In *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 389 (2000), the Supreme Court interpreted *Buckley* as recognizing "the broader threat from politicians too compliant with the wishes of large contributors." Thus, Land argues, Michigan need not demonstrate a history of actual corruption to have an interest in preventing the appearance of *quid pro quo* corruption. McNeilly argues *Citizens United*, 130 S. Ct. at 910, changed the way potential corruption is considered in determining that "[i]ngratiation and access . . . are not corruption." However, while the Supreme Court in *Citizens United* held that the government has no anti-corruption interest in limiting independent expenditures, it left intact the government's interest in limiting *individual contributions* in order to prevent *quid pro quo* corruption or the appearance of such corruption. *Id.* at 909. This factor therefore does not suggest Michigan's contribution limits are unconstitutional.

In evaluating the five factors set forth in *Randall*, McNeilly has not shown a likelihood of success on the merits of his claim that Michigan's individual contribution limits are unconstitutional. The district court found:

> [T]he *Randall* opinion is distinguishable for a number of reasons, and I think that if you look at prior case law which almost uniformly upholds individual contribution limits, and then you have *Randall* which is kind of a mixed bag, I don't think you can take anything from *Randall* that gives the plaintiff a strong argument that it has a significant, that he has a significant likelihood of success on the merits.

The district court decided that, while McNeilly may ultimately prevail on the merits, sufficient evidence was not presented regarding the contribution limits to show a likelihood of success on the merits under controlling precedent. The district court

emphasized the importance of showing the effect of contribution limits on the power to mount an effective campaign and noted the lack of evidence on such point, as the "only hard evidence" presented by McNeilly at this early point in the case was the lack of indexing of the contribution limits. The district court carefully considered the proper factors and found that the lack of indexing over time, by itself, did not get McNeilly to a likelihood of success on the merits. The district court did not err in its consideration of McNeilly's likelihood of success.

**B.**

**<u>Irreparable Harm to Movant</u>**

Second, McNeilly argues the district court committed error by failing to apply the principle that even a temporary deprivation of a protected right constitutes irreparable harm and by placing the burden on plaintiff to show irreparable harm. In *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976), the case relied upon by McNeilly,"respondents sufficiently demonstrated a probability of success on the merits" and "injury was both threatened and occurring at the time of respondents' motion"; it was "clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought." Once a probability of success on the merits was shown, irreparable harm followed. The *Elrod* Court found that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373. McNeilly argues the district court erred by not applying this principle. However, it is clear from the hearing transcript that the district court did not find irreparable harm because it did not find a probability of success on the First Amendment claim. The district court found: "I do not believe that the plaintiff has shown that he will suffer irreparable harm to important rights. I think there's been no showing that his First Amendment rights have been or will be abridged beyond constitutional limits." Because McNeilly does not have a likelihood of success on the merits, as discussed above, his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails.

**C.**

**Substantial Harm to Others**

Third, McNeilly argues the balance of interests favors granting the preliminary injunction because there are no concerns of genuine *quid pro quo* corruption. McNeilly argues "there is no empirical data to show that the existing limits are preventing any corruption" and that "the current levels have become arbitrary with the passage of time." McNeilly argues that he is currently prohibited from making the contributions he wishes to make and that an injunction allowing those contributions would not cause Michigan to be suddenly overwhelmed by corruption. The balancing of the harms, he argues, therefore favors an injunction. However, the balancing of harms is squarely within the discretion of the district court. As noted by the district court, a preliminary injunction enjoining enforcement of the statute would leave Michigan without limits on individual contributions:

> I think everybody agrees that if preliminary injunction issued in this case, there would essentially be no limits on individual contributions. I do not think that I have as much discretion – as a United States District Judge, I don't think I have the discretion to set substitute limits, and, in fact, the plaintiff hasn't suggested any basis for or any amounts for substitute limits to what are expressed in the statute.

Land argues that enjoining the enforcement of contribution limits would invite the very corruption that contribution limits are designed to prevent; also such an injunction would interfere with Land's ability to run an orderly election. In light of these considerations, and less than three months before Michigan's November general elections, the district court did not err in concluding "there will be significant harm to the defendant upon the issuance of a preliminary injunction."

**D.**

**Public Interest**

Fourth, McNeilly argues the public's interest will be served if the court grants a preliminary injunction, because it will allow a greater amount of debate on public

policy issues in the upcoming primary.  McNeilly argues "[a]llowing more money to flow from individual donors to candidate committees will naturally entail the type of speech our courts recognize as the 'precondition to enlightened self-government.'" However, Land argues the lack of limits would open the door to *quid pro quo* corruption or the appearance of it, which could discourage voters from participating in the elections. Land argues that without a finding that the statutory provision at issue is unconstitutional, the public interest cannot be served by an injunction leaving no individual contribution limits in place.  Given the failure to show a substantial likelihood of success on the merits of McNeilly's claim that the contribution limits are unconstitutional, the district court's conclusion that "the [adverse] effect on the public and the public interest" from enjoining the enforcement of the statute less than three months before the general election "would be very significant" is also proper.

## IV.

In conclusion, the district court did not abuse its discretion in denying McNeilly's motion for preliminary injunction.  The district court carefully considered all of the preliminary injunction factors and concluded the factors weighed in Land's favor because McNeilly did not demonstrate the need for such extraordinary relief. McNeilly does not have a substantial likelihood of success on the merits and thus failed to show irreparable harm while Land showed significant harm to the public from the issuance of a preliminary injunction.  For these reasons, the decision of the district court is AFFIRMED.