RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0244p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

STATE OF OHIO,

          *Plaintiff-Appellee*,

    *v.*

JANET YELLEN, in her official capacity as Secretary of the U.S. Department of the Treasury; RICHARD K. DELMAR, in his official capacity as Acting Inspector General of the U.S. Department of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY,

          *Defendants-Appellants*.

No. 21-3787

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:21-cv-00181—Douglas Russell Cole, District Judge.

Argued: January 26, 2022

Decided and Filed: November 18, 2022

Before: GRIFFIN, DONALD, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Daniel Winik, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Daniel Winik, Sarah E. Harrington, Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Benjamin M. Flowers, Sylvia May Davis, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. Joseph D. Henchman NATIONAL TAXPAYERS UNION FOUNDATION, Washington, D.C., Paul D. Clement, KIRKLAND & ELLIS LLP, Washington, D.C., Gary P. Gordon, Jason T. Hanselman, Kyle M. Asher, DYKEMA GOSSETT PLLC, Lansing, Michigan, Robert Alt, THE BUCKEYE INSTITUTE, Columbus, Ohio, John J. Vecchione, NEW CIVIL LIBERTIES ALLIANCE, Washington, D.C., Timothy Sandefur, Jacob Huebert, GOLDWATER INSTITUTE, Phoenix, Arizona, Drew C. Ensign, OFFICE OF THE ARIZONA ATTORNEY GENERAL, Phoenix, Arizona, for Amici Curiae.

---

**OPINION**

---

JOHN K. BUSH, Circuit Judge.  Seeking to mitigate the devastating economic effects of COVID-19, Congress enacted the American Rescue Plan Act ("ARPA" or "the Act") in March 2021.  *See* 42 U.S.C. § 802 *et seq.*  ARPA appropriated $195.3 billion in aid to the states and the District of Columbia.  But to get the money, states had to certify that they would comply with several conditions.  One was ARPA's "Offset Provision," which forbids a state from using the funds "to either directly or indirectly offset a reduction in the net tax revenue" that "result[s] from" a tax cut. § 802(c)(2)(A).  Claiming that this condition amounts to a prohibition on tax cuts during ARPA's "covered period," *id.*, and that such a condition would violate the Constitution in multiple respects, Ohio brought the present challenge.  *See, e.g.*, Mot. for Prelim. Injunction at 1–2, 5, R. 3.  And the district court found Ohio's objections persuasive, permanently enjoining enforcement of the Offset Provision on the ground that its terms are "unconstitutionally ambiguous" under the Spending Clause.  *Ohio v. Yellen*, 547 F. Supp. 3d 713, 740 (S.D. Ohio. 2021).

The Treasury Department appeals, arguing, among other things, that the district court should never have reached the merits of this case, as Ohio failed to establish a justiciable controversy.  We agree with Treasury.  Regardless of standing, the controversy is moot.  Treasury later promulgated a regulation (the "Rule") disavowing Ohio's interpretation of the Offset Provision and explaining that it would not enforce the Provision as if it barred tax cuts *per se*.  *See* Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26,786 (proposed May 17, 2021) (interim final rule); *see also* Coronavirus State and Local Fiscal Recovery Funds, 87 Fed. Reg. 4,338 (Jan. 27, 2022) (final rule); 31 C.F.R. § 35 *et seq.* We have no reason to believe that Treasury will not abide by its disavowal of Ohio's interpretation of the Offset Provision as it administers the statute.  So, we hold, Treasury's credible disavowal of Ohio's broad view of the Offset Provision mooted the case.  We thus reverse the district court's determination that the case is justiciable and vacate the permanent injunction.

**I.**

Like its sister-states, Ohio stood poised to receive billions of dollars from the federal government if it agreed, in accepting its ARPA funds, to abide by a number of attached conditions.  For instance, the Act provides that states must expend their funds in four particular areas that Congress deemed relevant to recovery from the pandemic:

(A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

(B) to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

42 U.S.C. § 802(c)(1)(A)–(D).

The Act also provides that states may *not* use their ARPA funds for two particular applications.  For instance, "[n]o State or territory may use funds made available under this section for deposit into any pension fund."  § 802(c)(2)(B).  Nor may the states use ARPA funds:

to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

§ 802(c)(2)(A).  This is the so-called "Offset Provision"—which Ohio has labeled the "Tax Mandate"—that lies at the center of the present suit.

Accompanying the Offset Provision are a couple of related enforcement mechanisms.  First is the statute's reporting requirement, which instructs the states:

To provide to the Secretary periodic reports providing a detailed accounting of—

(A) the uses of funds by such State, territory, or Tribal government, including, in the case of a State or a territory, all modifications to the State's or territory's tax revenue sources during the covered period; and

(B) such other information as the Secretary may require for the administration of this section.

§ 802(d)(2)(A)–(B).  Second is the statute's recoupment procedure.  Should a state violate the Act's requirements, Treasury may initiate a recoupment action to seek reimbursement from a state "equal to the amount of funds used in [the] violation."  § 802(e).

Six days after President Biden signed this text into law, Ohio filed its complaint outlining its objections to the Offset Provision.  First was its Spending Clause coercion argument.  In essence, Ohio said, by offering such a generous aid package during an economic crisis, the federal government left Ohio with "no real choice" but to accept the funds.  Complaint ¶40, R. 1. And such coercion was especially egregious because of its intrusion upon Ohio's "sovereign authority to set tax policy as it sees fit."  *Id.* ¶41.  Specifically, "because changes to tax policy that reduce revenues violate the Tax Mandate," Ohio alleged, the federal government had essentially conditioned the aid on Ohio's promise not to reduce taxes during ARPA's "covered period."  *Id.*  Otherwise, "[s]uch violations could be used to force the State to return funding received through the Act."  *Id.*  Second, Ohio claimed that the Offset Provision also violates the Spending Clause because "it is ambiguous regarding what precisely constitutes a change in tax policy that 'indirectly' offsets a loss in revenue."  *Id.* ¶43.  Yet "Spending Clause legislation must articulate 'unambiguously' the conditions it imposes on the states."  *Id.* (citing *South Dakota v. Dole*, 483 U.S. 203, 207 (1983)).[1]  And last, Ohio relatedly alleged that Congress had violated the Tenth Amendment by "commandeer[ing] state taxing authority" with the Offset Provision.  *Id.* ¶48.

---

[1]Ohio appears to have made these arguments in the alternative: that the Offset Provision either (1) forbids tax cuts, making it an unconstitutional intrusion upon state taxing authority, or, alternatively, (2) at least *could be read* to forbid tax cuts, but does not forbid such cuts sufficiently clearly to satisfy the Spending Clause.

On the same day it filed its complaint, Ohio also moved for a preliminary injunction. *See* Mot. for Prelim. Injunction, R. 3. It asked the district court to restrain the Treasury Department from pursuing any recoupment action during the litigation—until the district court could rule on Ohio's ultimate request for permanent-injunctive relief. And its accompanying memorandum further described the nature of Ohio's constitutional challenges. As to ambiguity, Ohio pointed out the basic principle that "[m]oney is fungible." *Id.* at 1 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 37 (2010)). Thus, it said, "any money that a State receives through the Act will necessarily offset, either directly or indirectly, every tax reduction that the State might pursue." *Id.* So the Offset Provision, which contains a prohibition on "indirectly" offsetting a tax cut with ARPA funds, could at least arguably be construed to bar states' ability to pursue tax cuts. *See, e.g.*, *id.* at 5 ("[E]very change in tax policy that leads to a decrease in tax revenue violates the Tax Mandate."). But even assuming that Congress might otherwise be able to impose such a condition with *unambiguous* text, Ohio argued alternatively, it couldn't have done so in *these* circumstances. For offering the state $5.5 billion in the midst of a crisis went beyond mere "mild encouragement" to surrender control over state taxation policy. *Id.* Such a generous offer was instead asserted to represent the very "coercion" and "dragooning" the Supreme Court has held the Spending Clause to forbid. *Id.* at 10–11 (citing *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582 (2012) (opinion of Roberts, C.J.)). Accordingly, Ohio asked the district court to enjoin enforcement of—and *only* of—the Offset Provision. *Id.* at 18 ("Ohio seeks to enjoin *only* the Tax Mandate[.]"). It thus left unchallenged ARPA's corollary restrictions, such as the four approved spending categories and the reporting requirement.

Treasury responded about a month later. It argued as an initial matter that Ohio's challenge was not justiciable under Article III. Ohio lacked standing, it said, because it had not alleged that it planned to enact "*any* tax cut, let alone shown that any hypothetical tax cut [would] decrease net tax revenue[,] or that the State plans to use Rescue Plan funds to offset that theoretical reduction." Opp'n to Mot. for Prelim. Injunction at 1, R. 29. Relatedly, it argued that Ohio's challenge was unripe. *Id.* at 1–2; *see also id.* at 8–12. Ohio's asserted injury was a potential recoupment action, yet Ohio had given the court no reason to think such enforcement proceedings were imminent. And it opposed Ohio's merits arguments across the board, contending that the Offset Provision was neither coercive (it does not threaten to take away

*existing* state funds) nor ambiguous (it clearly conditions states' receipt of ARPA funds on a promise not to use such funds to finance state tax cuts). *See id.* at 12–23.

Soon after that briefing, the district court held a hearing on the preliminary injunction, and it issued its decision denying such relief in May 2021. It agreed with the Treasury Department that Ohio's imminent-recoupment theory could not suffice for Article III jurisdiction, given that an enforcement action was then "too remote to satisfy the injury-in-fact requirement." Op. & Order at 17, R. 36. The district court reasoned that Ohio had not yet accepted ARPA funds at that point, so it was difficult to see why any enforcement proceeding might soon transpire. *Id.* For the same reason, it declined to issue a preliminary injunction on the merits: Because it was doubtful that Treasury would pursue recoupment before the district court could rule on Ohio's request for permanent relief, the district court exercised its equitable discretion to withhold preliminary relief. *Id.* at 32–35.

But the district court declined to dismiss Ohio's entire case on justiciability grounds, given its conclusion that Ohio was suffering a distinct, justiciable injury: the receipt of an "unconstitutionally ambiguous" spending offer. *Id.* at 15, 17–18. The district court reasoned that, under the Supreme Court's Spending Clause jurisprudence, states have the right to receive a spending offer that is unambiguous about whatever conditions it requires. *See, e.g.*, *id.* at 9 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Yet the Offset Provision was far from clear. *See, e.g.*, *id.* at 27. Its prohibition on "indirect" offsets, for instance, at least arguably could be read in the way that Ohio asserted it could: to prohibit essentially *any* tax cuts during ARPA's covered period. *Id.* at 26–27. True, Treasury disputed Ohio's reading and attempted to offer its own narrowing construction. *See, e.g.*, Opp'n to Mot. for Prelim. Injunction at 2–3, 21–23, R. 29. But because the Offset Provision itself did not clearly proscribe such cuts, the district court said, Ohio had suffered an "affront" to its sovereignty. Op. at 17, R. 36. In essence, it was forced to "ponder accepting an ambiguous deal." *Id.* at 15. So the district court believed *that* injury, even if insufficient for a preliminary injunction, sufficed to establish jurisdiction concerning the case overall. *Id.*

A day later, on May 13, 2021, Ohio accepted its ARPA funds. *See* Murnieks Dec. ¶3, R. 38-1. It thus certified to the federal government that it would comply with the Offset

Provision and the "regulations implementing [it]." Award Terms & Conditions, R. 38-1. Six days later, however, it filed its combined motion for a declaratory judgment that the Offset Provision is unconstitutional and a permanent injunction against the Offset Provision's enforcement.

Treasury's response argued, once again, that Ohio's challenge was both nonjusticiable and failed on the merits. At the permanent-injunction stage, however, it offered slightly different justiciability objections. First, Treasury pointed out that Ohio could no longer rely upon the injury the district court had first found persuasive: that the state was being forced to decide whether to accept the funds under the cloud of allegedly ambiguous conditions. Opp'n to Mot. for Permanent Injunction at 7–8, R. 45. For Ohio now *had* accepted the funds, mooting any concern about whether Ohio was suffering "a cognizable injury from uncertainty over the proposed deal." *Id.* at 8. Second, even if the Offset Provision itself were ambiguous, Treasury had now promulgated an Interim Final Rule ("IFR")—posted three days before Ohio had accepted the funds and published in the Federal Register four days after—that clarified Ohio's particular obligations. *Id.* at 8–9. And, indeed, the IFR disavowed Ohio's broad, money-is-fungible reading of the Offset Provision. *See* 86 Fed. Reg. at 26,807. Treasury explained that it did not read the Offset Provision to proscribe tax cuts *per se*, but only to bar tax cuts that (1) result in revenue reductions, and (2) for which a state fails to identify a permissible source of alternative offsetting funds, such as funds derived from a state tax increase on another activity, from a state spending cut in an area where the state is not expending ARPA funds, or from macroeconomic growth. *Id.* So Treasury claimed that the IFR had likewise mooted Ohio's "supposed ambiguity-as-injury" argument. Opp'n to Mot. for Permanent Injunction at 8, R. 45. And last, Treasury again pressed its view that the Offset Provision was neither coercively imposed nor a violation of the Tenth Amendment. *Id.* at 10–23.

The district court confronted these issues in its opinion and order on the permanent injunction, issued on July 1, 2021. *See Ohio*, 547 F. Supp. 3d at 713. Of particular importance is the district court's rationale for why it believed Ohio's challenge remained justiciable—even after Ohio's acceptance of the funds and after Treasury's promulgation of the IFR. The district court acknowledged that the initial reason for why it believed Ohio's challenge justiciable—that

Ohio was "contemplating whether to accept an ambiguous deal"—was "now gone." *Id.* at 724–25. Ohio had already accepted the funds, in other words, and so it was no longer "ponder[ing]" whether to accept the deal under a cloud of uncertainty. *Id.* But with *that* injury moot, the district court reasoned that the challenge remained justiciable because of a different injury Ohio was now suffering: that, having accepted the funds, it faced an "unlawfully-imposed quandary in determining how to exercise its sovereign taxing power." *Id.* at 725.

This particular theory of injury was intertwined with the district court's merits conclusion about the Offset Provision—that it is "unconstitutionally ambiguous" under the Spending Clause. *Id.* In essence, it said, because of the Offset Provision's indeterminacies, Ohio still labors under significant uncertainty about when Treasury might deem it to have "indirectly offset" a tax cut with ARPA spending. *Id.* at 725–27. And so the Offset Provision continued to unlawfully intrude upon Ohio's sovereign taxing authority, since it "cast[s] a pall over legislators' abilities to contemplate such tax changes." *Id.* at 725. Moreover, it concluded, the IFR could not cure that "pall" by providing the guidance required to make the funding conditions sufficiently clear to satisfy the Spending Clause. It grounded that conclusion on two bases. First, as it had already explained in its preliminary-injunction opinion, the IFR was just that—an *interim* final rule—and so its details could at least potentially change after the notice-and-comment period when Treasury promulgated its Final Rule. Op. at 28, R. 36. And second, in any event, the district court suggested that the Rule was simply *ultra vires* agency action. *Ohio*, 547 F. Supp. 3d at 734–39. For under the federalism canon and the major-questions doctrine, Congress had not delegated to Treasury, with sufficient clarity, the authority to promulgate a rule attempting to clarify the Offset Provision. *Id.* The district court thus concluded that the IFR's promulgation had not mooted Ohio's case.

On the merits, the district court then explained its view that the Offset Provision is "unconstitutionally ambiguous" under the Spending Clause. *Id.* at 740. Two major indeterminacies in the text of the Provision drove that conclusion. First, its prohibition on "indirect" offsets provides little guidance about when Treasury might deem Ohio to have used ARPA funds for an impermissible purpose. *Id.* at 731–33. Money is fungible, after all, and so the Offset Provision at least arguably could be read to proscribe Ohio's desired tax cuts during

ARPA's "covered period." *Id.* at 733. Moreover, the Offset Provision itself never explains the fiscal-year baseline against which Treasury will measure a "reduction" in net tax revenue. *Id.* at 731–32. And, depending on whichever baseline Treasury selects, Ohio's obligations could change substantially. The district court thus permanently enjoined the Treasury Department from enforcing the Offset Provision against Ohio. *Id.* at 741. Treasury timely appealed.

## II.

The district court's permanent-injunction order was a "final decision." *See, e.g.*, *Trayling v. St. Joseph Cnty. Emps. Chap. of Local #2995*, 751 F.3d 425, 426 (6th Cir. 2014). As a result, we have statutory jurisdiction to consider Treasury's appeal under 28 U.S.C. § 1291. We examine Article III jurisdiction below.

## III.

A fundamental principle under Article III is that we may adjudicate only live cases or controversies. *See, e.g.*, *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013). Thus, the plaintiff must show at the outset of the suit its standing to sue—that it has suffered an actual or imminent and concrete and particularized injury in fact traceable to the defendant and likely to be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And the plaintiff must continue to have a live interest in such a remedy throughout the proceeding. *Trump v. New York*, 141 S. Ct. 530, 534 (2020). If that interest is lost—for instance, through the advent of an "intervening circumstance" after the complaint is filed—then the plaintiff's case may become moot. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013). When that intervening circumstance is the defendant's voluntary abandonment of a contested behavior, however, the case remains live unless the defendant establishes that there is no "reasonable possibility" it will resume such behavior. *Resurrection Sch. v. Hertel*, 35 F.4th 524, 529 (6th Cir. 2022) (en banc).

Applying those principles, we conclude that, irrespective of whether Ohio established its initial standing to sue, its challenge is now moot.[2]  As the district court itself acknowledged, the injury that Ohio asserted in its complaint—that it was "ponder[ing]" whether to accept its ARPA funds under a cloud of uncertainty about the Offset Provision's meaning—"is now gone." *Ohio*, 547 F. Supp. 3d at 724.  Ohio accepted the funds nonetheless, and so it is no longer contemplating whether to take them. *That* alleged injury is now well in the past.  But there is, of course, no jurisdiction for injunctive relief unless the plaintiff establishes why a past harm is inflicting some injury at present or is likely to inflict some injury in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *see also Kanuszweski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019).  Thus, as the district court recognized, Ohio cannot rest on its claim that it was injured by having had to "ponder" a deal with unclear conditions. *Ohio*, 547 F. Supp. 3d at 724.  It instead must illustrate some ongoing or imminent future injury to keep the case alive.

The district court thought that showing satisfied, however, by what we will label the "pall" theory—that, at present, the Offset Provision "casts a pall over [Ohio's] abilities to contemplate" desired tax changes because it must labor under "an unlawfully-imposed quandary in determining how to exercise its sovereign taxing power." *Id.* at 725.  The district court believed that this "pall" theory was distinct from the question whether any recoupment action is imminent, and so Ohio's challenge remained live even if there were no realistic, imminent prospect of recoupment. *Id.* at 726–27 (claiming that Ohio "need not rely on the prospect of future recoupment to avoid mootness").  So it deemed the case live on that basis and entered its injunction accordingly.

---

[2]Though we must dismiss a cause before reaching the merits upon the discovery of a jurisdictional defect, "there is no mandatory 'sequencing of jurisdictional issues.'" *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)). Rather, "a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" *Id.* (citing *Ruhrgas*, 526 U.S. at 585).  Thus, we need not conclusively decide whether Ohio's theories sufficed to establish its standing when the complaint was first filed.  We are barred from reaching the merits in any event because of our determination that Ohio's challenge is moot. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

Yet we cannot agree that Ohio's challenge remained live even absent any imminent recoupment action. The very reason why there might be some "pall" over Ohio's tax policy is because pursuing a particular policy could entail a real-world consequence—a recoupment action. It is not enough that a statute may impose some "subjective chill" in the abstract upon a plaintiff's desired course of conduct.[3] *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (quotation marks omitted); *see also Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 610 (6th Cir. 2008). Rather, to mount a pre-enforcement challenge and obtain an injunction, the plaintiff must show why there is some realistic, likely risk of an enforcement proceeding if it were to engage in its desired behavior. *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). After all, equity does not enjoin laws themselves, but enjoins officials from taking action based upon those laws. *See Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) ("[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." (citing *California v. Texas*, 141 S. Ct. 2104, 2115–16 (2021)). And, moreover, justiciability must be established with the degree of evidence required at each successive stage of the proceeding. *Lujan*, 504 U.S. at 561. To obtain a permanent injunction, therefore, Ohio needed to submit concrete evidence about why Treasury might imminently pursue a recoupment action in response to its behavior past, present, or future.

But in this regard, Ohio came up short. Its steadfast contention below was that Treasury *could* read the Offset Provision in a broad way—as barring *any* tax cut during ARPA's covered period—and thus that it risked recoupment should it exercise its sovereign prerogative to cut taxes. Yet Treasury repeatedly disavowed Ohio's money-is-fungible reading of the statute. It did so in its briefing below, in the Interim Final Rule,[4] in its briefing before us, and in the Final

---

[3]We also note that it is difficult to see how the "pall" theory aligns with Ohio's real-world behavior. Even before the district court imposed its injunction, Ohio enacted a sizeable tax cut. *See* Appellee's Br. at 42. True, that was after the district court deemed the Offset Provision likely unconstitutional in its opinion denying a preliminary injunction. *Id.* at 48. But Ohio presented no evidence that its legislators considered any potential ramifications from the Offset Provision before enacting that tax cut. *See* Appellants' Br. at 10 ("Ohio identifies nothing in the record suggesting that the Offset Provision played any role in state legislators' enactment of that budget.").

[4]As we mentioned, the district court held that the Interim Final Rule did not suffice to moot the case because it was merely interim and thus could be revised through the notice-and-comment process. Op. at 28, R. 36. But even if we assume that particular ruling is correct, Ohio has conceded that the Final Rule is the same as the Interim Final Rule in all respects material to this dispute. *See* Flowers Letter, ECF No. 49 ("Because the Final Rule is materially identical to the interim final rule in all respects relevant to this case, its issuance does not affect the

Rule as well.**5**  *See, e.g.*, Opp'n to Mot. for Prelim. Injunction at 17–18, R. 29; 86 Fed. Reg. at 26,807; Appellants' Br. at 5; 87 Fed. Reg. at 4,426.  In the face of those facts, we conclude that Treasury established there is no "reasonable possibility" it will adopt Ohio's broad view of the Offset Provision.  *Resurrection Sch.*, 35 F.4th at 525.  As a result, Ohio needed to establish why it would not only enact a tax cut, but *also* that such a cut would (1) result in a reduction in its net tax revenue, and (2) that Ohio would then offset such a reduction with ARPA funds, or (3) fail to identify a permissible source of offsetting funds from a state spending cut, state tax increases in some other area, or macroeconomic growth.  86 Fed. Reg. at 26,807; 87 Fed. Reg. at 4,426.  Only *then* would Treasury seek recoupment.  But we have no evidence that Ohio will pursue that course of conduct.  So we have no reason to believe that Treasury will initiate recoupment against any policy that Ohio has shown, with evidence, it intends to pursue.

Resisting that conclusion, Ohio claims on appeal that it still suffers five distinct and cognizable injuries from the Offset Provision, and so its challenge remains live.  We find none of those arguments persuasive, however, and we will address them one by one.

*First*, Ohio says, it was injured when it was denied its entitlement to an unambiguous and non-coercive offer.  Appellee's Br. at 46–48.  Yet we have already largely dealt with this assertion above.  Even assuming that the initial offer was ambiguous or coercive, those are

analysis of the questions presented.").  So even if there were a possibility Treasury could have modified its view of the Offset Provision from the Interim Final Rule to the Final Rule in a way that could have saved Ohio's claims, in actual fact, it did not.

**5**We have no need to opine here on whether agency regulations may validly clarify an otherwise-ambiguous Spending Clause condition or whether, even if an agency could do so for ordinary spending legislation, it could not have done so here under the major-questions doctrine or federalism canon.  *Contra Ohio*, 547 F. Supp. 3d at 734–39.  The argument that the Rule is *ultra vires* under the major-questions doctrine or federalism canon might have supported an attempt to seek vacatur of the Rule under 5 U.S.C. § 706, but Ohio has never asked for vacatur of the Rule.  So the still-standing Rule continues to bind Treasury in its administration of the statute.  The justiciability of Ohio's pre-enforcement constitutional challenge thus hinges on whether it showed it would violate *the Rule*— irrespective of whether the Rule is potentially unauthorized or does not represent the best reading of the statute— since violation of the Rule is what would provoke recoupment.  In other words, even if the underlying spending legislation here *is* constitutionally infirm, the unchallenged Rule has prevented Ohio, based on the harms it asserted, from having established a concrete controversy in which it could advance its merits objections to the Offset Provision.  We would also note that even if the Rule *were* vacated, Treasury has consistently represented that the text of the Offset Provision *alone* refutes the money-is-fungible interpretation.  *See, e.g.*, Opp'n to Mot. for Prelim. Injunction at 17–18, R. 29 (explaining Treasury's position, before the advent of the IFR, that the text of the Offset Provision alone did not support Ohio's reading); *see also* Recording of Oral Arg. at 7:21–9:00 (disclaiming that the validity of the Offset Provision hinges "in any way" on the Rule, calling the Rule "not relevant," and arguing that the statute is valid on its own).

merely past injuries. That a past offer could have been clearer or fairer does not create jurisdiction for injunctive relief. Rather, Ohio had to establish why that past injury had some continuing negative effect redressable with a prospective remedy. *See Lyons*, 461 U.S. at 105; *see also Kanuszweski*, 927 F.3d at 406. So this theory of injury is insufficient, by itself, to establish jurisdiction.

*Second*, perhaps realizing this prospectivity issue, Ohio asserts that the Offset Provision "arguably proscribes" its desired tax policies. Appellee's Br. at 41–43, 49. Ohio makes that argument by asserting, again, that "any revenue-negative reduction in tax rates *could be* read to contravene the Mandate." *Id.* at 42. But even assuming that's true, Treasury subsequently explained that it does *not*, in fact, read the Offset Provision as proscribing "*any* revenue-negative reduction in tax rates." *Id.* (emphasis added). Nor will it take enforcement actions based on tax cuts *per se*. Rather, it has repeatedly explained its position that it will pursue recoupment under the Offset Provision only should a state enact a revenue-reducing tax cut *and* then fail to identify a permissible source of offsetting funds, such as those derived from other state tax increases, state spending cuts, or macroeconomic growth. So even if the Offset Provision "*could be* read" in a broader way, Treasury pointedly does *not* read it that way. Given that Treasury has repeatedly and credibly disavowed Ohio's broad reading of the Offset Provision, we fail to see why there is a reasonable possibility of a recoupment action predicated on that broad reading. *See Missouri v. Yellen*, 39 F.4th 1063, 1069 (8th Cir. 2022).

*Third*, Ohio asserts, with little elaboration, that the Offset Provision interferes with its sovereign authority and the "orderly management" of its affairs. Appellee's Br. at 43–44. Again, however, we cannot see how this can be so, when, after Treasury's disavowals, Ohio never established any particular conduct it wishes to pursue but against which Treasury may credibly take action. Nor, as we explain below, did Ohio put forth any concrete evidence about how the Offset Provision interferes with the "orderly management" of its affairs, at least in a way that might be redressed by enjoining enforcement solely of the Offset Provision.

*Fourth*, Ohio argues that it was injured when it was forced to choose between "receiving federal benefits" or "surrendering some of its sovereign authority over tax policy." Appellee's Br. at 45. But for the reasons we have already explained, a past choice without a demonstrated

continuing negative effect does not establish jurisdiction for injunctive relief.  *See Lyons*, 461 U.S. at 105; *see also Kanuszweski*, 927 F.3d at 406.  Nor has Ohio established a continuing and concrete harm, given that it has identified no policy it wishes to pursue but that Treasury regards as proscribed.  So there is no reason to suppose, based on what Ohio has shown it wishes to do, that there is a reasonable possibility Treasury will hale it into a recoupment action that a federal court of equity might enjoin.

*Fifth* and last, Ohio claims that the Offset Provision inflicts compliance costs upon it that would be redressed by letting the injunction stand.  Appellee's Br. at 45–46.  It says that these costs arise in two discrete ways.  First, "States that accept Rescue Plan funds are statutorily bound to provide a 'detailed accounting' proving their compliance with, among other things, the Mandate."  *Id.* at 46 (citing 42 U.S.C. § 802(d)(2)).  And second, it asserts, Ohio has been "forced to reallocate resources to ensuring compliance with the Mandate."  *Id.*  Yet, separate from our mootness analysis above, we find neither of these points sufficient to have even established Ohio's standing to seek an injunction of the Offset Provision.

Take the point about the reporting requirement first.  Unlike the Offset Provision—which represents a substantive prohibition on how states may use ARPA funds—the reporting requirement simply instructs states to *report* "the uses of [such] funds" and "other information" pertinent to "the administration of this section."  42 U.S.C. § 802(d)(2)(A)–(B).  So it is possible for a state to be in compliance with the Offset Provision—using ARPA funds exclusively for permissible purposes—yet in violation of the reporting requirement, should it fail to convey a "detailed accounting" of those permissible uses to Treasury.  *Id.*  Or, conversely, a state could violate the Offset Provision—directly or indirectly offsetting tax cuts with ARPA funds—and remain in compliance with the reporting requirement, so long as it informed Treasury that it was using ARPA funds for impermissible purposes.  *Compare* 42 U.S.C. § 802(c)(2)(A), *with* § 802(d)(2)(A)–(B).  So the Offset Provision and the reporting requirement are simply different portions of the statute with different purposes and different effects on the states.

But those facts are fatal to Ohio's compliance-costs argument.  For even if enforcement of *the Offset Provision* were enjoined, Ohio still would have to furnish a "detailed accounting" of how it used its ARPA funds so that Treasury could ensure Ohio's compliance with all the other

*unchallenged* use restrictions. *See, e.g.*, 42 U.S.C. § 802(c)(1)(A)–(D). Additionally, Ohio never waged the uphill battle that the Offset Provision and reporting requirement are inseverable, so that an injunction against the Offset Provision brings down the reporting requirement as well. *Cf. Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2209 (2020); *Free Enter. Fund v. Pub. Co. Acc. Oversight Bd.*, 561 U.S. 477, 508 (2010). To the contrary, Ohio was adamant that its challenge is *only* to the Offset Provision; it makes no claim that the reporting requirement itself is void or unenforceable. *See, e.g.*, Mot. for Prelim. Injunction at 18, R. 3 ("Ohio seeks to enjoin *only* the Tax Mandate[.]"). Thus, to establish a compliance-costs injury from the reporting requirement redressable by enjoining enforcement of the separate Offset Provision, Ohio would have needed evidence about why the reporting-costs burden would have been lowered from the injunction even if the reporting requirement itself were left operable. Yet Ohio furnished no such evidence to the district court. So we have no evidentiary basis to conclude that an injunction against the *Offset Provision* is somehow redressing a compliance-costs injury traceable to the separate and unchallenged reporting requirement.

That leaves us with Ohio's vague claim about how it has been "forced to reallocate resources to ensuring compliance with the Mandate." Appellee's Br. at 46. Ohio never made this allegation in its complaint, *see* Recording of Oral Arg. at 12:20–12:40; *cf. Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) ("Standing is to be determined as of the time the complaint is filed." (cleaned up)), and it has provided no insight about the alleged resources it is referring to. Moreover, Ohio had the burden to establish whatever such costs have ensued with *evidence*; conclusory allegations about them in its briefing could not suffice. Yet Ohio put forth no "specific facts" by "affidavit or other evidence" about what, if any, particular resources it has reallocated to ensure compliance with the Offset Provision. *Lujan*, 504 U.S. at 561.[6] As to the resource-reallocation claim, therefore, we lack the requisite basis to conclude that Ohio established a concrete and particularized injury in fact.

---

[6]That the Supreme Court was speaking here in the context of the showing required to illustrate justiciability at a summary-judgment proceeding only underscores the deficiency of Ohio's showing. For "the proof required for the plaintiff to obtain a [permanent] injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000); *see also McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

**IV.**

As Treasury itself acknowledges, our decision today does not permanently deprive Ohio of the opportunity to challenge any of ARPA's funding conditions. Appellants' Br. at 10–11; Reply Br. at 7–8. Rather, should a future, justiciable dispute arise, Ohio may reassert its merits arguments therein. *Id.* But Ohio did not establish that *this* challenge is justiciable. Accordingly, we reverse the district court's determination otherwise and vacate the permanent injunction.